SUPREME COURT.   Chenango General Term, May, 1859.   *Mason,*
*Balcom* and *Campbell*, Justices.

## THE PEOPLE *v.* JAMES BLAKELEY.

A communication made to an attorney at law, by a person seeking professional
advice or assistance to enable him to forge a contract, is not privileged, and
the attorney, when called as a witness, can be required to disclose it.

It is competent to ask a witness, on his cross-examination, with a view to affect
his credibility if affirmatively answered, whether he had not been guilty of
adultery, and had a venereal disease since his marriage.  If the facts thus
inquired into are wholly collateral to the issue in the case, the witness may
refuse to answer such questions, and no inference unfavorable to the character
of such witness can be drawn from such refusal.

Where the prisoner was tried on a charge of having forged the name of W. B.
to a note and contract, dated 16th or 17th of April, 1855, and it appeared
that at such dates W. B. was confined to his bed by sickness, and that he died
on the 20th of that month, and that he had given up all hopes of recovery as
early as the 13th of the same month, it was held to be competent for the
prisoner to prove, that on the 18th of that month W. B. stated to the witness
that he had signed the note and contract in question.

On reversing a judgment of the Oyer and Terminer, by which the prisoner was
sentenced to imprisonment in the State Prison, and ordering a new trial therein,
the Supreme Court further ordered that the prisoner should appear at the next
Court of Oyer and Terminer, to be held in the county in which he had been
convicted, to stand trial on the indictment, and not depart the court without
its leave, and abide its orders and judgment.

The prisoner was tried, at the Delaware Oyer and Terminer,
in August, 1858, for forging and uttering, as true, a note and
contract, which were in the words and figures following, to wit:

"KORTRIGHT, April 17, 1855.
"Thirty days from date, for value received, I promise to pay
James Blakeley, or bearer, one thousand dollars, with use.
                              "WILLIAM BLAKELEY."

"KORTRIGHT, April 16, 1855.
"I hereby acknowledge that the receipt given to me by my
brother, James Blakeley, thirty-two years ago, in full of all
notes, book accounts, actions, and causes of action, either in

The People *v.* Blakeley.

law or equity, to his full satisfaction, was obtained from him by fraud and through fear of bodily harm; and I further acknowledge that the judgment then rendered in his favor for three hundred and twenty-five dollars was just, and that I always intended to pay the same, but still have neglected so to do. Said judgment, principal, and interest is not included in the receipt executed by the said James Blakeley to me, on or about the 12th day of April, 1855, nor in any other receipt ever before executed by him to me, and the whole amount of said judgment, principal and interest still remains due and unpaid. Now, therefore, in consideration of the premises, I hereby agree and promise to pay the said James Blakeley the sum of three hundred and twenty-five dollars, with the interest that may have accrued on the same from the 16th day of April, 1823, by the 1st day of June, if I recover from this sickness; if not, I desire that the same be paid out of my estate, as soon as possible, by my executors. ·

"WILLIAM BLAKELEY."

It was proved that William Blakeley was a brother of the prisoner, and that he had resided many years in Kortright, in the county of Delaware. He died there on the 20th day of April, 1855. He lost all hope of living as early as the 13th day of that month.

*William G. Blakeley*, a witness for the People, who was a son of the deceased, gave evidence that tended to show the prisoner was guilty of the crime for which he was tried. On his cross-examination, he testified as follows, namely: "I am 37 years of age; I left my father's fifteen years ago; I was married in 1846; commenced keeping house in 1847; I kept house two or three years; after that I separated; I have not since cohabited with my wife."

Question by the prisoner's counsel: Have you had the venereal disease since you were married?

This question the court overruled, and decided it was not proper; and counsel for the prisoner duly excepted.

The prisoner's counsel then asked the witness if he had not, since he was married, had connection with other women than

his wife; which question the court overruled, and decided that the same was incompetent; to which decision the prisoner's counsel excepted.

The prisoner's counsel then asked the witness whether he had not, since he was married, had the pox; which question the court decided was not proper, and overruled the same; to which decision the prisoner's counsel excepted.

The counsel for the prisoner offered to prove by the witness that he had connection, since he was married, with other females than his wife, that he had contracted a venereal disease, and had the pox, in order to show that he had led a vicious and dissolute life; but the court decided that the said testimony so offered, was illegal and incompetent. To which decision the prisoner's counsel excepted.

*Sheldon A. Givens,* a witness for the People, testified as follows: I know James Blakeley; about five weeks after I heard of the death of William Blakeley, and about the 25th of May, 1855, he came to me in a lot, where I was engaged, and said he wanted to talk with me some when alone, where none could hear; I went with him to a dwelling house." The witness then testified that he was then an attorney and counsellor at law of the Supreme Court, practising at Harpersfield, and that he had been, previous to this, counsel for the defendant.

The counsel for the prisoner objected to any proof of what the prisoner then and there said to the witness, upon the ground that it was privileged; but the court overruled the objection, and the prisoner's counsel excepted.

The witness then further testified: "The prisoner wished me to draw a paper that would have the effect of reviving or keeping alive a judgment. He said 25 years before, he obtained judgment against William Blakeley, before Zacharias Smith, Daniel Little and some one else, and he gave the amount quite large. He said William made him surrender the judgment without paying for it, and he wanted I should draw a paper that would have the effect to revive and keep alive that judgment. I told him I would have nothing to do with it, and advised him not to. He said I need not be afraid

The People *v.* Blakeley.

of any exposure; he would set down and make a copy himself, so that my handwriting should not go out. He produced a receipt of the 12th of April, from William, a few days before, and pointed out and called my attention to the signature, and said "You know that is genuine." I think I recognize the receipt here in court of April 12th, 1855, signed William Blakeley, as the one he had. I think he showed it to me, and said, "You know that is his handwriting." The prisoner then asked me what was to pay; I said nothing; and he said, there is two dollars—take this—you did some business for me in a horse trade.

On his cross-examination the witness said: "I had done business for James before April, 1855. He asked me what was to pay, and gave me two dollars, and I kept it."

The counsel for the prisoner then asked the court to strike out the testimony of the witness, Givens, upon the ground that the communication was privileged, which the court refused to do, to which refusal the prisoner's counsel excepted.

The prisoner afterwards gave evidence which tended to show that the note and contract, which he was tried for forging, were seen on the 18th or 19th of April, 1855, signed as they appeared to be at the trial.

The prisoner offered to prove that William Blakeley, deceased, admitted to a witness, on the 18th of April, 1855, that he had signed the note and contract in question, but the court, upon the objection of the district attorney, rejected the offer, to which the prisoner's counsel excepted.

The district attorney produced receipts signed by the prisoner, (one of which was dated the 12th day of April, 1855,) which showed that the defendant and the deceased had settled all demands that existed between them prior to the date of such receipts; and he also gave other evidence that tended to show there was no consideration or indebtedness to uphold the note and contract that were alleged to have been forged; and thereafter the prisoner offered to prove admissions made by William Blakeley, deceased, prior to the 16th of April, 1855, to the effect that he owed the prisoner the judgment mentioned

in the contract, and also that he had collected money of one Leal for the prisoner, which he had never accounted for to the prisoner, and that he intended to pay the prisoner therefor; but upon the objection of the district attorney, the court rejected such offer, and the prisoner's counsel excepted.

Witnesses were examined who were acquainted with the handwriting of the deceased, some of whom testified they were of the opinion the signatures to the note and contract in question were in the handwriting of the deceased; the others thought they were not in his handwriting.

The jury found the prisoner *guilty,* and he was sentenced to imprisonment in the State Prison at Auburn for the term of two years.

The prisoner's counsel made a bill of exceptions, which was duly signed and incorporated into the record of the defendant's conviction.

A writ of error was allowed by one of the justices of this court, with a direction that it operate as a stay of proceedings on the judgment against the prisoner. The writ and a copy of the record were sent to this court by the clerk of Delaware county.

*John Grant* (District Attorney), for the People.

*A. Becker,* for the defendant.

*By the Court,* BALCOM, J. The declarations of the prisoner, proved by the witness Givens, were made thirty-nine days subsequent to the date of the contract in question. When they were proved, no evidence had been given that the contract had been seen by any person prior to the time they were made. Such declarations, therefore, were properly admitted to show that the contract was not in existence when William Blakeley died, nor within thirty-nine days subsequent to its date. But it is claimed by the prisoner's counsel, that because Givens was an attorney of this court, and was being consulted as such by the prisoner when the declarations were made, they were

privileged, and therefore covered by the seal of professional confidence. This position is clearly untenable. An attorney may testify to any communication made to him to obtain professional advice or assistance, as to the commission of a felony or other crime which is *malum in se.* (*The Bank of Utica* v. *Mersereau*, 3 *Barb. Ch. R.*, 598.) Nothing, therefore, was privileged that the prisoner said to Givens, if he was seeking professional advice or assistance to enable him to forge the contract; and he was seeking such advise or assistance, if Givens correctly related the conversation between them.

The next question I shall consider, is, whether the prisoner's counsel should have been permitted to ask the witness, William G. Blakeley, on cross-examination, if he had not had a venereal disease and been guilty of adultery subsequent to his marriage. The counsel stated to the court his object in putting the question was to show that the witness "had led a vicious and dissolute life."

Roscoe lays down the rule that "questions with regard to particular facts tending to degrade the witness and affect his character and credit may be put to him on cross-examination, even though irrelevant to the matter in issue; but the party putting them must be satisfied with the answers given by the witness, and cannot call witnesses to prove those answers false. (*Roscoe's Cr. Ev.*, 4th *Am. ed., from* 3d *London ed.*, 180.) And this rule is too firmly established to be questioned. (See *The People* v. *Rector*, 19 *Wend.*, 569; *Southard* v. *Rexford*, 6 *Cowen*, 254; *Ward* v. *The People*, 6 *Hill*, 144; *Barbour's Cr. Tr.*, 399, 400, 401, 402; 4 *Wend.*, 229; *Roscoe's Cr. Ev.*, 307; *Cow. & Hill's Notes*, 419; *Howard* v. *The City Fire Ins. Co.*, 4 *Denio*, 502; *Lohman* v. *The People*, 1 *Comst.*, 379; 1 *Greenl. Ev.*, §§ 456, 460.) Greenleaf states this qualification to the rule, namely: "Questions, the answers to which, though they may disgrace the witness in other respects, yet will not affect the credit due to his testimony," are generally suppressed. (1 *Greenl. Ev.*, § 548.) He places, in this class of questions, one frequently put to the principal female witness, in trials for seduction *per quod servitium amisit*, and on indictments for rape,

&c., whether she had not previously been criminal with other men, or with some particular person; and he cited a case where, on the trial of a female prisoner for stealing from a person in a house, the prisoner's counsel was not permitted to ask the prosecutor whether, at that house, anything improper passed between him and the prisoner. (1 *Greenl. Ev.*, § 458.) And in a note, he refers to the case of *Macbride* v. *Macbride* (4 *Esp. Rep.*, 242), where the plaintiff called a woman as a witness to prove a part of his demand, and Lord Alvanley refused to allow the defendant's counsel to ask her whether she slept with the plaintiff. But these views are in conflict with the decision of this court in *The People* v. *Abbot* (19 *Wend.*, 192). Now, with all due respect for the opinions of this learned author, I must say, it seems to me the cases referred to by him do not properly fall within the qualification he states to the rule as laid down by Roscoe; for the reason that the commission of adultery or fornication injures the general character of either sex; and the degree of credit due to the testimony of a witness, depends as well on his general character as on that for mere veracity. Vicious habits of whatever kind, sear the conscience and prepare those who practice them for the easy utterance of falsehood. The late Justice Cowen thought the credit of a witness was much affected, when he confessed, upon a cross-examination, he had for some time led an idle and intemperate life, the inmate of porter houses at hours unseasonably late, and had for two years been wasting his means in a course of adulterous lewdness, alienated from his family, unjust to them and to his creditors. (*See The People* v. *Rector*, 19 *Wend.*, 586.)

In *Lohman* v. *The People* (1 *Comst.*, 379), the principal witness to sustain the indictment was a female, and she was interrogated without objection, on cross-examination, with the view of discrediting her, as to whether she had had sexual intercourse with any person other than one Cook, by whom she testified she became pregnant; and she was also asked whether she had not had the venereal disease; but she declined to answer the interrogatories, and the court refused to compel her to answer them, and to such refusal the prisoner's counsel

excepted.  Judge Gardiner, in delivering the opinion of the Court of Appeals in that case, assumed, that if the witness had given affirmative answers to the interrogatories, they would have affected her general character; but he held, the court did right in refusing to compel her to answer the interrogatories. It was adjudged in *The People* v. *Abbot* (*supra*), that on the trial of a person charged with the crime of rape, or an assault with intent, &c., the inquiry may be made of the prosecutrix, on cross-examination, whether she has not had previous criminal connection with other men, and that, in such case, she is not privileged from answering; also that on such a trial the prisoner may show the prosecutrix to be in fact a common prostitute.  All that Lord Ellenborough decided in *Dodd* v. *Norris* (3 *Camp.*, 519), was that the plaintiff's daughter, who testified the defendant was the father of a child she had had, could not be compelled, on cross-examination, to answer whether, before her acquaintance with the defendant, she had not been criminal with other men.

Now, notwithstanding the above mentioned views of Greenleaf, and the cases cited by him to support them, the weight of authority is in favor of allowing questions to be put to witnesses on cross-examination, which do not relate to the matter in issue, if affirmative answers thereto would affect the general character of the witnesses.  And in the case under consideration, I am of the opinion the prisoner's counsel should have been permitted to ask the witness Blakeley, on cross-examination, whether he had not been guilty of adultery, and whether he had not had a venereal disease since his marriage; for the reason, if such questions had been allowed and answered in the affirmative by the witness, his general character would have been somewhat impeached (1 *Greenl. Ev.*, §§ 455, 456), and it would then have been for the jury to determine whether his evidence was entitled to full credit.  If the questions had been allowed and the witness had refused to answer them, as he might because they called for facts wholly collateral to the issue, no inference unfavorable to his character could have been drawn from such refusal. (*Barbour's Cr. Tr.*,

401; 1 *Greenl. Ev.*, § 451; *Cow. and Hill's Notes*, 747, 748.)
Lord Ellenborough in *Millman* v. *Tucker* (2 *Peak.*, 222), told a
witness, on his being asked by Erskine whether he had not
been convicted of forging coal-meters' certificates, that he need
not answer; and he told the jury that the witness, having
availed himself of the privilege, was not thereby at all dis-
credited; and he also said he himself should, had he been
asked such a question, have refused to give an answer, for the
sake of the justice of the country, and to prevent such an
examination.

The district attorney had no right to object to the questions
that were put to the witness, William G. Blakeley, in this case.
(1 *Greenl. Ev.*, § 451; *The People* v. *Bodine*, 1 *Denio*, 280;
*Ward* v. *The People*, 6 *Hill*, 144; *Barbour's Cr. Tr.*, 400.)  But I
think it is proper for the court, when such questions are put, to
inform the witness of his privilege to decline answering. (*Cow.
& Hill's Notes*, 747.)

The only other question in the case which I shall consider,
is whether the prisoner should have been permitted to prove
that the deceased stated to a witness, on the 18th day of April,
1855, he had signed the note and contract in question.  The
bill of exceptions shows, "it appeared in evidence that all
hopes of recovering by the deceased ceased on the 13th of
April, 1855;" also, that he died on the 20th day of that month.
The contract and note bore the dates of April 16th and 17th,
.1855.

I was inclined, on the argument, to the opinion that the
above mentioned declaration was properly rejected as mere hear-
say, in accordance with the general rule, which declares "such
evidence is inadmissible to establish any specific fact, which, in
its nature, is susceptible of being proved by witnesses, who can
speak from their own knowledge." (*See Wharton's Am. Cr. Law*,
244.)  But subsequent reflection, and an examination of the
authorities, have satisfied me the declaration should have been
received as evidence.  I will first remark that no person other
than the prisoner, except the deceased, had any certain know-
ledge as to whether the latter signed his name to the note or

contract; and unless the prisoner wronged him, or attempted to wrong him, by forging his name to those instruments, he committed no offence against the people; and it was against the interest of the deceased to say, on the 18th day of April, 1855, he had signed the note and contract. Secondly, declarations, which are secondary evidence, are sometimes received in consequence of the death of the person making them, whether they were made at the time of the fact declared, or at a subsequent day, when it is shown that he possessed competent knowledge of the facts, or that it was his duty to know them, and that the declarations were at variance with his interest. Greenleaf says: "When these circumstances concur (meaning in a proper case), the evidence is received, leaving its weight and value to be determined by other considerations." (1 *Greenl. Ev.*, § 147; *Whtte* v. *Chouteau*, 10 *Barb.*, 202.) He further says, while speaking of the admissibility of this class of declarations in certain cases: " The ground upon which this evidence is received, is the extreme improbability of its falsehood." (*Id.*, § 148.) And he again declares: "In some cases the admissions of third persons, *strangers to the suit*, are receivable. This arises when the issue is substantially upon the mutual rights of such persons, at a particular time, in which case the practice is to let in such evidence in general as would be legally admissible in an action between the parties themselves." (1 *Greenl. Ev.*, § 181. *See Kelly's case*, 3 *City Hall Recorder*, 153.) It is true this is said only in regard to civil actions; but the rules of evidence in criminal cases are, in most respects, the same as in civil cases. (*Barb. Cr. Tr.*, 351.)

Roscoe declares that the declarations of deceased persons, made against their own interests, are admissible in some cases, " as where a man charges himself with the receipt of money, it is evidence to prove the payment." (*Roscoe's Cr. Ev.*, 4th *Am. ed.*, 26.)

The reason usually assigned for the rejection of mere hearsay as evidence, is its incompetency to satisfy the mind as to the existence of the facts sought to be established, as well as the frauds that may be practised under its cover. (*Wharton's*

*Am. Cr. Law*, 2d ed., 244.) But what proof would be more convincing in this case, that the prisoner is innocent of the crime with which he is charged, than the declaration of the deceased, on the 18th day of April, 1855, that he had settled with the prisoner, and executed the note and contract in question? I answer, not any, except the positive assertion of a credible witness that he saw the deceased sign his name to them. The adverse interest of the deceased, and the fact that he believed he was on his bed of death, repel the idea of any fraudulent intent on his part in declaring he had executed the note and contract; and if he made that declaration while in his right mind, the presumption that it was true is exceedingly cogent, yea, almost morally certain. I must, therefore, hold that the declaration should have been received as evidence for the prisoner.

The judgment of the Delaware Oyer and Terminer should be reversed for the two erroneous rulings I have specified, and a new trial granted to the prisoner in that court; and he should be required to appear at the next Court of Oyer and Terminer, to be held in Delaware county, to stand trial on the indictment, and not depart that court without leave, and abide its orders and judgment.

CAMPBELL, J., concurred in the foregoing opinion. MASON, J., concurred in the same upon the first two propositions discussed in it, but expressed no opinion on the last question contained in it.

Judgment accordingly.