## J. W. SPEARMAN v. STATE.

### No. 1538.   Decided January 22, 1913.

**1.—Perjury—Evidence—Papers in Civil Suits.**

Where, upon trial of perjury, the State was permitted to introduce in evidence the petition, answer, and judgment of the civil suit out of which the prosecution for perjury grew, and upon which it was based to show that the court had jurisdiction, etc., there was no error; besides, the bill of exceptions was defective in not pointing out the alleged error in the introduction of such papers.

**2.—Same—Husband and Wife—Declarations of Defendant—Impeachment.**

Where the alleged perjury was based principally upon the fact of defendant's sworn statement that he had never had carnal intercourse with his wife before their marriage, and he so testified in his divorce proceedings against her, there was no error in permitting said wife, she being divorced at the time, to testify in detail to the acts of intercourse between her and defendant before their marriage.

**3.—Same—Evidence—Bill of Exceptions.**

Where it developed in a prosecution for perjury that defendant had sent away his wife in order to procure a divorce from her out of which the perjury proceeding originated against him, there was no error in permitting her to testify that she left the State, etc.; besides, the bill of exceptions was insufficient.

**4.—Same—Evidence—Husband and Wife.**

Where, upon trial of perjury, the statements testified to by the divorced wife of defendant were made to her by the defendant at least three weeks after he had procured a divorce from her and that they were not then, and never afterwards, husband and wife, and such statement related to the false testimony of the defendant in a divorce suit against her out of which the prosecution for perjury against him originated, there was no error; besides, the bill of exceptions was defective.

**5.—Same—Evidence—Reputation for Chastity.**

In a prosecution for perjury, there was no error in excluding testimony as to the unchastity of defendant's divorced wife for the purpose of impeaching her testimony.

**6.—Same—Evidence—Husband and Wife—Cross-examination—Depositions.**

Where the defendant introduced the depositions of his divorced wife showing what she had testified in his divorce suit against her, among other things that she had never had carnal intercourse with him before their marriage, which was false, and the prosecution was based thereon against the defendant, there was no error in permitting the State, on cross-examination, to show why and how she came to so testify and that she was induced to do so by the defendant.

**7.—Same—Charge of Court—Questions of Law.**

Where the State was permitted to introduce the papers in the civil suit out of which the prosecution for perjury against the defendant grew, as a

predicate, there was no error in the court's failure to submit to the jury for its finding whether or not such civil suit was pending, as this was a matter of law and not of fact.

### 8.—Same—Charge of Court—Limiting Testimony.

Upon trial of perjury, where the pleadings in a civil suit out of which the prosecution originated were admitted in evidence, it was proper for the court to tell the jury why such testimony was introduced.

### 9.—Same—Charge of Court—Falsity of Testimony—Perjury.

Where the prosecution for perjury was based upon defendant's testimony in a divorce suit against his wife that he had not had sexual intercourse with her before he married her, which was alleged and shown to have been false, and the court charged the jury that they must believe from the evidence beyond a reasonable doubt that the falsity of said statement had been established by the testimony of two credible witnesses, or by one credible witness strongly corroborated by other evidence, and that said false statement made by defendant was wilfully and deliberately made, the same was sufficient.

### 10.—Same—Requested Charges—Bill of Exceptions.

Where bill of exceptions to the refusal of defendant's requested charges was entirely too general to require this court to pass thereon, there was no error; besides, they were essentially embraced in the main charge.

### 11.—Same—Evidence—Husband and Wife—Cross-examination—Public Policy.

Where, upon trial for perjury, based upon the testimony of defendant that he had never had carnal intercourse with his wife before their marriage, it was shown that he surreptiously obtained a divorce from her upon testimony of his said wife which he falsely induced her to make, to the effect that she had had no such carnal intercourse with him before their said marriage there was no error, after defendant had introduced in evidence such testimony in the form of the said wife's depositions, to permit the State, on cross-examination of said former wife to have her relate the circumstances why and how she was induced by defendant to make such false depositions, and this although said depositions were made during their marriage relation, as the law prohibiting one spouse to testify against the other is not applicable in cases of this kind as a matter of public policy. Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Titus. Tried below before the Hon. P. A. Turner.

Appeal from a conviction of perjury; penalty, three years imprisonment in the penitentiary.

The opinion states the case.

*Ralston & Ralston* and *Ward & Ward*, for appellant.—On question of cross-examination of wife: Johnson v. State, 28 Texas Crim. App., 17; Jones v. State, 38 Texas Crim. Rep., 87; Gaines v. State, 38 Texas Crim. Rep., 202; Meritt v. State, 39 Texas Crim. Rep., 70; Gross v. State, 61 Tex. Crim. Rep., 76; 135 S. W. Rep., 373.

*C. E. Lane*, Assistant Attorney-General, for the State.—On question of the court's charge in failing to submit the question as to whether the matter upon which the perjury was based was material: Washington v. State, 23 Texas Crim. App., 336; Jackson v. State, 15 id, 579; Smith v. State, 27 id, 50.

PRENDERGAST, JUDGE.—Appellant was convicted of perjury and his penalty fixed at three years in the penitentiary.

At the March Term 1908, of the District Court for Titus County, Mrs. Stella Spearman brought suit against J. W. Spearman, appellant, for divorce and to set aside the judgment theretofore, October 10, 1907, procured by him against her in said same court then and there decreeing him a divorce against her. The record discloses that the said suit by Stella Spearman against appellant was tried in said court regularly before the District Judge thereof at the October Term, October 8, 1908. In that trial appellant, in the indictment herein, among other things, is charged to have testified falsely and committed perjury in that he testified on said trial October 8, 1908, that he had never had carnal intercourse with Stella Culpeper, then Stella Spearman, before he married her. He married her on July 29, 1907.

There is a good deal of evidence in the case which it is unnecessary for us to here state. Among other things, appellant testified in this case that on the trial of said case, October 8, 1908, he had testified as charged in the indictment, but he claimed his testimony in that respect was true.

From all of the evidence in the record the jury were clearly and fully authorized to believe this state of facts:

Stella Culpeper, in February and March 1907, was a young country girl, uneducated, having attended school very little, was altogether inexperienced in the world and had not been about much. Appellant at that time was a matured man,—perhaps thirty years of age,—and was a school teacher, teaching in the country about ten miles from where Stella and her parents then lived. He was somewhat related to her father. Shortly prior to February 1907, appellant was at her father's and induced her parents to let her board in the community near his school and attend his school as a pupil. They thereupon sent her to a countryman to board who lived about one mile from the school building, about the middle of February 1907, for the purpose of her attending appellant's school. From this boarding-house she did attend his school continuously perhaps as much as six weeks until the term closed the latter part of March 1907. She was fifteen years of age February 29, 1907,—was not fifteen years of age at the time she began attending his school. She, with other children, and appellant himself, it seems, took their noon lunches to school with them and remained at the school-house and on the grounds thereabouts at the noon recess which was usually about an hour. Soon after Stella began attending his school, appellant began to make love to her, professing to love her, etc., and in the early part of March began to solicit and try to induce her to permit him to have sexual intercourse with her. She at first would not consent, but after further solicitation on his part and his promise to her that if she became pregnant he would marry her, she yielded to his embrace and during that month he had

sexual intercourse with her three several times from which by him she became pregnant, and a child was born to her December 22, 1907.

Stella missed her menses in April, having been regular for some time before then up to the March period which she had. Appellant repeatedly after March had talks with her thereabouts. She told him that she had missed since March and he became very uneasy thereabouts. They repeatedly and from time to time from March until July 29, 1907, when they married, talked about her pregnant condition and he continued to be very uneasy thereabouts. Shortly before their marriage, he brought Stella from her home to Mount Pleasant, the county seat of Titus County, to a boarding-house. Even before then he had consulted with a physician at Mount Pleasant, telling him that in March preceding he had had sexual intercourse with Stella three several times and was very anxious to know from him whether she was pregnant thereby. While she was at this boarding-house he had the physician to pass by it, he to have her out where the doctor could see her, and give appellant his opinion of whether or not she was then pregnant. In this way, without her knowledge, he had the doctor to surreptitiously appear at this boarding-house and see her. After the doctor saw her, he saw the doctor and was very anxious to know what the doctor's opinion was. The doctor could not then tell him, and while he had told the doctor that she had missed her monthly periods from March up to that time, the latter part of July 1907, from that fact alone and her then appearance the doctor could not tell him whether she was then pregnant. At any rate, he then concluded to, and in a few days after this, did marry Stella and lived with her as his wife from that time to October 10, 1907, the very day on which he procured the said decree of divorce against her. Just before, or just after he married the girl, he talked to another doctor and asked him what was good to produce an abortion.

Shortly before the term of the said District Court in October 1907, while appellant was living with Stella, as his wife, in the town of Mount Pleasant, Texas, he brought a suit for divorce against her in said court, had her properly served with citation prior to the term and on September 25, 1907, had the district clerk of said court, with his attorney, go to his residence and take her depositions. He had her therein, in answer to his interrogatories to swear that when she married him she had been pregnant about four months; that so far as she knew he knew nothing of her being pregnant when she married him; that he had never had intercourse with her prior to his marriage to her and he was not the cause of her pregnancy. He also had her therein to refuse to answer who was the cause of her pregnant condition; that she knew she was pregnant when she married him and did not tell him that she was and that she, that morning, the day she answered the interrogatories, admitted to him her said condition; that she had theretofore denied it to him; that all this testimony by her in answer to these interrogatories, was, as a matter of fact, untrue.

That in March 1907, he had intercourse with her three times from which she became pregnant by him and that he knew it; that they frequently discussed it, both before and after their marriage; that he instigated her to give this false testimony in his divorce suit against her by representing to her that her pregnancy would soon become publicly known; that she would have a child all of which, if it became known, would result in the grand jury indicting him and his being sent to the penitentiary because of his having intercourse with her in March 1907; that she believed his representations in this respect and gave said false answers to said interrogatories at his instigation and to save him from the penitentiary; that he told her what answers to give to each interrogatory and she answered as he instructed her; that she loved him, he was to be the father of her child and she did not want him sent to the penitentiary.

Notwithstanding she answered said interrogatories as stated above and they were at once filed in the court, he continued to live with her as his wife from then until the very morning that he got his divorce, October 10, 1907. On the very early morning of that day he shipped her off to Oklahoma to prevent her from appearing before the grand jury and avoid any indictment against him for having had sexual intercourse with her before he married her. When she had been in Oklahoma about a month after the grand jury had adjourned, he wrote to her to come back but not to come to Mount Pleasant but stop at Omaha, in Morris county, a small place on the railroad, where he would meet her. She complied with his instructions, stopped at Omaha where he did meet her and took her from there to a neighbor's to stay all night, thence to her uncle's the next day, he paying her hotel bill, etc. When she reached Omaha and met him on this occasion he told her he supposed that they had divorced him; that the clerk had thrown the books open and the Judge had seen her depositions and granted a divorce. She then told him that he had promised her he would get no divorce but that he simply wanted her depositions, to the effect that she had given them, in order to keep him from going to the penitentiary. He said the divorce made no difference, that he would remarry her and live with her. He had nothing whatever to do with her after he first got his divorce from her. She was remarried to a Mr. Simms of Dallas in October 1910 and at the time of this trial was the wife of Simms. As soon as the case was tried, October 8, 1908, appellant was arrested on complaint for perjury. He gave bond. Then fled, and although diligently sought by the sheriff for two years could not be found. After two years and five days he voluntarily surrendered.

In order to show the matter at issue in the divorce suit by Stella against appellant in 1908, the State introduced her petition in that case, his answer and his divorce decree against her of October 10, 1907. This petition is some seven pages of typewritten matter. Other than a copy of it in the bill, the bill is very meager and does not state

the matter so that this court can know therefrom the status of the case and the bearing thereof. Appellant's objections thereto were general. He in no way pointed out any special portion thereof that was objectionable, but his objections went to the introduction of it for any purpose whatever. What we have said about this bill equally applies to appellant's bill objecting to the introduction of his said answer, and the same is true of his third bill to the copy of said judgment.

Certainly all of these papers were clearly admissible for the purpose for which the State introduced them. Even if there should have been any particular allegation or other matter in any of these papers that was objectionable that particular item should have been objected to and pointed out to itself. A mere objection to the introduction of the whole thing would not reach any such matter. The court stated to the jury in his charge that said petition, answer and judgment were introduced to show that a civil judicial proceeding was pending in the District Court of Titus County, and that that court had jurisdiction and that issue was formed therein and told them that they could not consider such evidence for any other purpose and that such evidence was not corroborative and could not be considered by them to show perjury.

A material question in the case was, whether or not appellant had had sexual intercourse with Stella in March 1907, before he married her and whether his testimony denying such intercourse was true or false. It was, therefore, material and proper that the court should permit her to testify in detail to these acts of intercourse. Appellant's bill on this question is so meager as not to apprise this court of the surrounding circumstances as to whether or not this testimony was inadmissible. His objection to it was that it was wholly immaterial and irrelevant. In our opinion it was both material and relevant and the court did not err in admitting it.

The next bill merely shows that while Mrs. Stella Simms was on the stand testifying she was asked, "where were you on October 10, 1907?" She answered, "in Oklahoma." Then she was asked how long she stayed there. She replied she did not know exactly,—that she went to stay twenty days. Appellant objected to this because it was immaterial and irrelevant. The bill shows no error whatever.

The next bill is as meager, if not more so, than any of the others and is wholly insufficient, under the long established rules of this court to require or authorize this court to consider it. Briefly, it states that while Mrs. Stella Simms was on the witness stand, the State was permitted to prove, over his objections, that while she was in Oklahoma appellant wrote to her to come home and stop at Omaha and that he would meet her there; that in response to his request she did come and he met her and took her in a buggy to her uncle's; that he then told her that while the court was in session someone had permitted the books to get open and the Judge saw her depositions and

granted him a divorce, but he did not think it amounted to anything, and he could not tell until he saw the papers and that even if he had been granted a divorce he would take her, remarry her and they would live together. The appellant's objections to this evidence was that it was immaterial and irrelevant; that the divorce was granted and afterwards suit was brought to set it aside and re-instate the relations of husband and wife, and that divorce judgment was obtained through fraud and was set aside on that ground, and any testimony as to any conversation between the witness and appellant after they were married until the divorce was finally granted to her in 1910, was in contravention of the statute. That the divorce granted to appellant in October 1907 was void. This is the substance in full of this bill. It is clearly insufficient to authorize, or require us to pass on the questions attempted to be raised. See Secs. 857, p. 557, and 1123, p. 732 of White's Ann. C. C. P. for a collation of some of the authorities on the insufficiency of such a bill. Even if we could consider the matter at all, the bill clearly shows that these statements testified to by Mrs. Simms were made to her by appellant at least three weeks after he had procured a divorce against her and that they were not then and never afterwards husband and wife.

Appellant has several bills of exceptions showing that he offered to prove by some five witnesses that at the time of this trial Mrs. Simms' general reputation, where she formerly lived in Titus County, for chastity was bad, for the purpose of impeaching her testimony in this case. Clearly under the authorities such testimony was inadmissible as the lower court properly held.

The only other bill of appellant's shows that while Mrs. Simms was a witness for the State that the State was permitted to ask her why, and to explain why, she gave the answers she did to the said interrogatories of appellant in his suit against her for divorce; that appellant objected to this because it was immaterial, irrelevant and a confidential communication between husband and wife, during their coverture, was a violation of the statute and the witness could not be required to testify to any communication made to her by her husband during coverture; that in answer to these questions she stated substantially what is shown on the subject in the preliminary statement above, of the proof in this case. The court explained the bill briefly by showing that appellant filed suit against his wife for a divorce; that she testified by depositions in substance as above shown; that she was asked to explain why she testified in answers as above set forth. What we have said about the bills above is equally applicable to this. It is wholly insufficient to require us to pass upon the questions attempted to be raised. However, if we could go to the record to ascertain the facts, we could find that the State did not have Mrs. Stella Simms,—formerly Spearman,—to testify to any communication whatever between appellant and her while she was his wife, but that after the State had introduced its proof and rested, appellant himself

introduced said depositions of his wife showing what she had testified in his divorce suit against her and upon which he got his divorce, thereby, in effect, making her his witness. The State then, in cross-examination, after he had thus introduced her and had her to testify, merely asked her what is stated in the bill and she then explained why she had so testified in appellant's divorce suit against her. Clearly, the appellant having introduced her and proved by her material testimony for himself, the State had the right to cross her to show the circumstances of why and how came her to so testify. Johnson v. State, 28 Texas Crim. App., 17; Jones v. State, 38 Texas Crim. Rep., 87; Gaines v. State, 38 Texas Crim. Rep., 202; Merritt v. State, 39 Texas Crim. Rep., 70, and many other cases.

Complaint is made of certain paragraphs of the court's charge, among them, because the court did not submit to the jury for its finding whether or not a civil judicial proceeding was pending in said court and whether or not issue was joined therein by Stella Spearman and appellant. While it is proper to show these matters, when shown, as in this case, by the pleadings introduced in evidence, it becomes a matter of law and not of fact and it was not necessary that they should be submitted to the jury for a finding. Foster v. State, 32 Texas Crim. Rep., 39; Washington v. State, 23 Texas Crim. App., 336; Jackson v. State, 15 Texas Crim. App., 579.

It was entirely proper for the court to state to the jury in his charge, as he did as stated above, why the said pleadings and judgment were introduced and to tell the jury for what they could be considered and what not, and such charge is not subject to the objection that it was upon the weight of the testimony.

Complaint is made to the charge of the court, among other grounds, that it did not submit to the jury whether appellant's testimony to the effect that he had not had sexual intercourse with Sella Culpepper before he married her was in fact false. An inspection of the charge shows that the court did submit this question to the jury and required them to believe beyond a reasonable doubt that such testimony was false before they could convict appellant. It may be that the charge is not very happily expressed but it did require the jury to believe from the evidence beyond a reasonable doubt before they could convict him, that the falsity of his said statement had been established by the testimony of two credible witnesses, or by one credible witness strongly corroborated by other evidence and that said false statement by him was made willfully and deliberately.

The record shows that several special charges were requested by appellant and refused. No reason whatever is given in the requested charge or in the ground of the motion for new trial complaining of the refusal to give them, why they should be given. In the motion for new trial, the only complaint is that the court erred in failing to give to the jury his special charge No. ——, filling the blank with the respective numbers of the charges. This is entirely too general to

require this court to pass upon the question. However, we have examined these special charges and so far as the questions stated by any of them were material to have been given, they were in substance embraced and given in the main charge of the court.

There being no reversible error pointed out the judgment will be affirmed.

*Affirmed.*

### ON REHEARING.

### January 22, 1913.

HARPER, JUDGE.—This case was affirmed at a former day of this term in an opinion by Judge Prendergast, and as I concur in his opinion he has requested that I write my views on the motion for rehearing.

Appellant in his motion raises but one question, and that is the court erred in permitting the State, in rebuttal, to prove by Mrs. Simms why she made the false statement in her depositions as to appellant's relations with her. The question is not one entirely free of difficulty. Mrs. Simms was formerly Mrs. Spearman, and the State in making its case proved no fact that occurred while the marriage relation existed. It appears from the record that appellant was a school teacher, and Mrs. Simms one of his scholars. Appellant by his wiles seduced her, and to cover up his offense married her. It appears that after marrying her, he made certain representations to her, which will hereinafter be set forth, and induced her to swear that he was not the father of her child ,and had never had intercourse with her prior to their marriage. He then sent her away to another State, and when the case was called for trial that he had instituted, he testified also that he was not the father of the child and had never had intercourse with her prior to his marriage. Upon her return home, learning that she had been divorced during her absence, she brought suit to set aside the divorce, alleging that such allegations were false. The decree granted in his favor was set aside, and his wife granted a divorce. On the trial of this latter case, appellant again testified he had never had intercourse with Mrs. Simms prior to their marriage, and that he was not the father of her child. He was indicted for perjury, and on this trial the testimony was adduced on which this error is assigned. The depositions introduced by appellant read as follows:

"I married J. W. Spearman (appellant) on July 29, 1907. I was pregnant at the time I married J. W. Spearman. I had been pregnant about 4 months. So far as I know Mr. Spearman knew nothing of my condition as to being pregnant. He had never had intercourse with me and was not the cause of my being pregnant. I refuse to answer who was the cause of my pregnant condition. I knew that I was pregnant when I married Mr. Spearman. I did not tell him that I was pregnant. I admitted to Mr. Spearman this morning of the

condition that I was in as to my being pregnant. I had denied to him all the while that I was pregnant until this morning. I told him all about it.

"Mr. Claude Pittman was keeping company with me during the month of March, 1907. We were engaged to be married. We were first engaged the 25th of March, 1907. He didn't come for me as he promised. We were to have been married in July, 1907. He stopped coming to see me in June. Mr. Spearman has been kind to me since I married him and provided well for me and bought everything for me that I have needed."

Thus it is seen that appellant was seeking to use on this trial the depositions of his wife, taken at his instance, to prove that he was not guilty of perjury in swearing that he had not had intercourse with his wife prior to their marriage, and that he was not the father of her child.

Now, after he introduced this evidence of his wife, should she be compelled and required to remain silent and let her child be bastardized ,and herself stamped as a wanton? We think not. Mr. Greenleaf ih his work on Evidence, Sec. 337, in speaking of why the law does not permit the husband nor wife to testify as to communications occurring between them while married, says: "The great object of the rule is to secure domestic happiness by placing the protecting seal of the law upon all confidential communications between husband and wife, and whatever has come to the knowledge of either by the means of the hallowed confidence which that relation inspires cannot be afterwards divulged in testimony, even though the other be no longer living." The rule is founded upon the policy of the law, the object of which is to secure domestic happiness by protecting that state in the inviolability of its confidences. What would tend to create a breach of such confidence is therefore disfavored by the law. Does this come within the reasons for the rule? Appellant, in violation of his vows at the marriage altar, had sought and was seeking to ruin the character of his wife, and by false testimony to get a divorce from her and to throw her out on the cold charity of the world under circumstances that we know all good women would shun her. It would have been more merciful for him to have cut her throat than to have placed this stigma upon her name and character.

Appellant himself took the stand and testified. The court permitted the State to call the wife, and permitted her to testify in rebuttal to the circumstances under which she had given the depositions introduced in evidence by defendant. She testified: "I remember about what is in those depositions shown me by counsel for the defendant this morning. Q. Now, I will read these answers to you, and want you to explain to the jury why it was that you gave those answers: First, you gave your age—Stella Spearman, age 16; second, Yes sir, I married J. W. Spearman, etc.; third, I was pregnant at the time I married J. W. Spearman; I had been pregnant about 4 months; so far

as I know Mr. Spearman knew nothing of my condition as to being pregnant. Now why was it you made that answer, Mrs. Simms? A. Well, Mr. Spearman said that I had it to do, in the condition things were. Q. Now just tell the jury fully now your reasons for that— what was your reasons and all that he said to you about it. A. He said we had to fix up those papers and that if we didn't, the grand jury would catch him up and send him to the pen. I don't remember how long it was before I signed those answers that he first mentioned that to me. He said to me that he would have the papers fixed and that you and Mr. Mitchell I believe would come there and take the deposition. He did not make any further explanation than that he said he would have to fix those papers up, and I would have to sign those papers to keep him from going to the pen. He said he would be likely to have to go to the pen for getting me pregnant before we were married. I believed what he told me about it. I don't know anything about law. I was only 16 years of age at that time. He told me to deny all the time that he was the father of the child that I was pregnant with. He told me to deny that he had had intercourse with me before we were married. He told me to deny that he had any knowledge or knew anything about me being pregnant at the time of the marriage. He didn't tell me how to answer the question if they asked me who was the cause of my being pregnant, only just to not tell anyone—not name anyone. He told me to answer it that way. He told me that not very long before the time I made those answers; I can't remember though how long. I believe I went to Oklahoma the next day after I answered those interrogatories; I don't exactly remember. I don't remember whether it was late in the afternoon when I made those answers. I don't remember exactly whether or not I left on the next morning's train. He was the cause of my going to Oklahoma; he said I had to go to Oklahoma; said if I stayed here they would get me in court and send him to the pen if they got my testimony against him. I believed it. I didn't know no better. I thought he was telling me the truth. I didn't know at the time I left here after signing these answers, that he was going to try to get a divorce from me. I never found out that he had got a judgment dissolving the bonds of matrimony existing between him and me until I got back home from Oklahoma.''

In the original opinion Judge Prendergast held that as defendant had introduced in evidence her testimony taken while they were man and wife, it was permissible for the State to show under what circumstances such testimony was given. He would not be permitted to use the depositions as evidence on this trial, without the jury being acquainted with all the facts incident to giving those depositions.

This is the part of the opinion assailed in the motion, and it is claimed that these depositions were introduced to impeach her—to show that she had made different statements. It would be a new rule of law to hold that you could introduce the statements of any witness or cir-

cumstance to impeach her testimony, and not permit the witness to state the circumstances under which the statement was made—that she was in duress; that same was obtained by fraudulent devices or misrepresentations, made under a misapprehension, or any other ground which existed which would shed light on whether or not the statement was such as in fact affected her credibility.   This is not the law.   Tubb v. State, 55 Texas Crim. Rep., 606; Gibbs v. State, 20 S. W. Rep., 919; James v. State, 40 Texas Crim. Rep., 190; Smith v. State, 52 Texas Crim. Rep., 344; Turner v. State, 51 S. W. Rep., 366; Hicks v. Hicks, 26 S. W. Rep., 227; Jackson v. Mumford's, Exr., 74 Tex., 104; I. & G. N. R. R. Co. v. Locke, 67 S. W. Rep., 1082.   It is thus seen that this court, our Supreme Court, and the Court of Civil Appeals have all held that where it is sought to impair the credit of a witness by showing different statements, etc., the witness should be permitted to explain the transaction.

Mrs. Simms having testified to certain facts before her marriage to defendant, when the defendant introduced these depositions to impair her credit as a witness, it was permissible for the court to permit her to explain the matter, and the defendant cannot invoke the statute that prohibits her from testifying as to communications between husband and wife.   Had he not introduced these depositions, she should not, and doubtless would not, have been permitted to testify to those matters, but as he introduced these depositions to prove that while married to him she had so testified, there is no law that would prevent her explaining why she did do so, and the opinion of Judge Prendergast is amply supported by authority in this State and other states.   But the writer, and he here is expressing his individual opinion, thinks the testimony was admissible on higher and broader grounds.   As hereinbefore shown, the reason for this rule of law is to promote and secure domestic happiness, not to destroy it, nor permit one to use it as a shield to make a wanton out of his wife and bastards out of his children.   Mr. Blackstone has well said: ''Law is a rule of civil conduct prescribed by the supreme power of the State, commanding what is right and prohibiting what is wrong.''   The Legislature of our State in providing that ''neither husband nor wife shall in any case testify as to communications made by one to the other while married,'' had a high, noble and laudable object and purpose in view.   It was recognized that the safety and perpetuity of our institutions rested on the purity and integrity of our homes, and it is a wise public policy that will not permit one to step inside and mar the domestic happiness of a man and his wife.   But ''communications'' protected are those incident to and growing out of this confidential relation, of the trust each reposes in the other.   It is the consensus of opinion that the most perfect happiness can be obtained only where there is mutual confidence and trust one in the other, and they can confide in and seek counsel from each other, and even though one should be guilty of a crime against the State, yet so long as they are true to each other, the policy

of the law is that the domestic relations shall be respected and protected, and the law will not ruthlessly step in and mar those relations. It is also known and appreciated that a wife, so long as she loves and trusts her husband, is as but clay in his hands, to be moulded to a great extent to suit his purposes; especially is this so when danger threatens him, and it is not surprising when her husband tells a young wife, who loves him, that the penitentiary door stands ajar ready to receive him, she can be induced to give voice to such schemes as he may devise, even though it wrings her heart to do so. And when a man, relying on these traits of womanhood and wifehood, shall misuse this trust and confidence, lie to her, and induce her to testify to facts which would blight her life, and the life of her child, in order to save him from punishment he represents as impending (which in fact did not exist), the law throws no such protecting shield around such conduct as will prevent her from telling the truth and reestablishing her good name and fame when he seeks by this means to wrong her. Such a law would not be a protection to the home life and family relations, but would permit a consummate scoundrel to prey upon the love and affection of a good woman, work his nefarious designs, consign her to a hell here on earth, and yet go scot free, under such a construction of the law. We have no precedent in this State so far as we have been able to find, but in Beyerline v. State, 147 Ind. 125, the defendant was being tried, charged with forging another's name. He sought to avoid punishment by pleading he did not sign the name to the note, and while the evidence is not clear in the reports, yet it would seem he sought to throw suspicion on his wife, when the court permitted his wife to testify that it was true she signed the name to the note, but that her husband "caught her by the back of the neck and compelled her to sign the name." In that State the statute also prohibits the husband and wife from testifying as to communications made to each other. (Rev. Stat. of Ind. 1894, Sec. 504.) In that case the court says: "Where the criminal, in seeking advice and consolation, lays open his heart to his wife, and the law regards the sacredness of their relation, and will not permit her to make known what he has thus communicated. But if what is said or done by either has no relation to their mutual trust and confidence as husband and wife, then the reason for the rule falls." And it has been so held by this court in Richards v. State, 55 Tex. Crim. Rep., 278; 116 S. W. Rep., 587, Judge Davidson rendering the opinion. See also Cole v. State, 51 Tex. Crim. Rep., 89; 101 S. W. Rep., 218; Ex parte Fatheree, 34 Texas Crim. Rep., 594. Where it is thus shown that instead of giving to the wife that love and protection the law presupposes, he would use the statute as a shield for his wrong doing and work to her injury to serve him in an unlawful purpose, as said by the Supreme Court of Missouri, speaking through Judge Sherwood, in discussing this question, Vol. 99, page 421: "It would be simply monstrous to permit a party to take advantage of his own wrong, and assist his fraud by such an objection.

The rule he invokes was intended to subserve a very wise, wholesome and holy purpose, but never to further such an end as that for which he invokes it.'' See also 134 Mo. 580.

Analogous to this is the protection given by the law to communications between attorney and client, which are held to be privileged. In passing on this question, the Supreme Court of Michigan, of which that eminent and able law writer, Judge Cooley, was Chief Justice, in the case of People v. Van Alstine, 57 Mich., 79, says: ''But there are exceptions to the general rule, based upon public policy and public security. Professional communications are not privileged when such communications are for an unlawful purpose, having for their object the commission of a crime. They then partake of the nature of a conspiracy, or attempted conspiracy, and it is not only lawful to divulge such communications, but under certain circumstances it might become the duty of the attorney to do so. The interests of public justice require that no such shield from merited exposure shall be interposed to protect a person who takes counsel how he can safely commit a crime. The relation of attorney and client cannot exist for the purpose of counsel in concocting crimes. The privilege does not exist in such cases. 1 Gilb. Ev., 277; Greenough v. Gaskell, 1 Mylne & K., 98; Coveney v. Tannahill, 1 Hill. (N. Y.) 33; Bank of Utica v. Mersereau, 3 Barb. Ch., 528; People v. Blakeley, 4 Park. Cr. Rep., 176; 1 Whart. Cr. L., Sec. 773; Roscoe's Cr. Ev., 150.''

Our own court in the case of Orman v. State, 22 Texas Crim. App., 617, adopts this line of decisions, and declares it to be the law, that communications having relation to the commission of crime are not protected as privileged. It is true that this rule is not applicable to the relations of husband and wife to the full extent stated as to attorney and client, because the law has so high regard for the home, and is so solicitous to throw its protecting shield around it, that even though one should communicate to the other his intention to commit crime, it would not permit either spouse to so testify, but this is for the reason that it desires nothing shall be done to disturb the marital relation, deeming it essential to the best interest of the State, and of the highest public policy. But in a case like this, where, if such was the law, it would be but an instrument to break up and tear down the domestic relations, bastardize children, and work incalculable mischief, there is no public policy to be subserved. It is only in rare instances where the wife should be permitted to testify in a case against her husband, but when the occasion does arise, trial judges should, as did the learned trial judge in this instance, interpret the law according to its true intent and meaning, and not permit a too literal interpretation of words work inconceivable mischief, and the law become a shield and cloak to intentional criminal conduct, and where the husband would ruin whom it is his duty to protect—his wife. Cole v. State, 51 Tex. Crim. Rep., 89; 101 S. W. Rep., 218.

The motion for rehearing is overruled.    *Overruled.*

DAVIDSON, Presiding Judge (dissenting).—This case is before us on motion for rehearing, the case having been previously affirmed. My brethren have concluded to overrule the motion for rehearing for reasons stated in the written opinion to that effect. I do not care to review the opinion on rehearing or the former opinion seriatim but in a general way state my reasons for not concurring.

While the witness, Mrs. Stella Simms, who was formerly the wife of appellant, was on the witness stand, defendant, on her cross-examination, she being used by the State, identified her depositions taken in a divorce suit between herself and appellant. This is taken from the bill of exceptions: "This which is now shown me is my signature. I don't know whether I know or recognize this paper now shown me or not (examine same). I guess I do; I don't know exactly whether I do or not. I suppose I did make the statements therein contained." On redirect examination by the State she testifies as follows relative to this deposition: "At the time I signed the paper recently shown me by Mr. Ward I was living at Mr. Spearman's house; was living with him at the time. Q. Now with reference to the time you signed that did you or not go anywhere? A. No sir, I did not go anywhere. I went to Oklahoma shortly after these depositions were signed by me. I think I went the next day after I signed them; I think I did. It was a short time afterwards." After the State had closed the defendant offered the depositions of the witness to contradict her testimony, and the record shows this: "The witness Stella Spearman being duly sworn, deposes and says as follows:

To the First interrogatory she answered:

Stella Spearman, age 16.

Second interrogatory: Yes. I married J. W. Spearman on July 29, 1907.

Third interrogatory: I was pregnant at the time I married J. W. Spearman. I had been pregnant about four months. So far as I know Mr. Spearman knew nothing of my condition as to being pregnant. He had never had intercourse with me and was not the cause of my being pregnant. I refuse to answer who was the cause of my pregnant condition. I know that I was pregnant when I married Mr. Spearman. I did not tell him that I was pregnant. I admitted to Mr. Spearman this morning of the condition that I was in as to my being pregnant. I had denied to him all the while that I was pregnant until this morning, I told him all about it.

Fourth interrogatory: Mr. Claude Pittman was keeping company with me during the month of March, 1907. We were engaged to be married. We were first engaged the 25th of March, 1907. He didn't come for me as he promised. We were to have been married in July, 1907. He stopped coming to see me in June.

Fifth interrogatory: Mr. Spearman has been kind to me since I married him and provided well for me and bought everything for me that I have needed."

The State subsequently recalled Mrs. Stella Simms, formerly Mrs. Stella Spearman, and had her testify at some length, and, among other things, to confidential communications between appellant and herself during their marital relations, and in reference to the statements made by him to her in regard to what her testimony should be in a divorce proceeding between herself and appellant then pending. Among other things she says, ''He told me to deny that he had had intercourse with me before we were married. He told me to deny that he had any knowledge or knew anything about me being pregnant at the time of the marriage. He didn't tell me how to answer the question if they asked me who was the cause of my being pregnant, only just to not tell any one—not name anyone. He told me to answer it that way. He told me that not very long before the time I made those answers. He told me to deny all the time that he was the father of the child that I was pregnant with.''

Various objections were urged, and, among others, that the above were confidential communications between husband and wife. The depositions, some of which were introduced in evidence, were taken in the divorce proceedings. The matters about which she testified when recalled by the State were not in the depositions, and she was called on by the State to give her reasons why she had testified and the reasons she testified as she did in the divorce case and there cover some of the confidential communications above mentioned, and, among other things, she also stated that he told her that he would go to the penitentiary if she testified he was the father of her child. I am not undertaking here to state the testimony in detail but the substance of it. I am clearly of the opinion that this evidence was not admissible either as original testimony or as sustaining testimony of other matters about which she had testified. She testified in this particular case subsequent to her divorce, and in the divorce case, and it seems to have occurred to the State, and so held by the trial judge, that she could testify to confidential communications made to her by her husband as her reasons why she testified as she did in the divorce case and the State used that testimony or those reasons and confidential communications made to her to sustain her testimony in this case and assist in making out a case against the defendant on this criminal charge. In the rehearing opinion my brethren somewhat, at least, if not entirely, place their reasoning on the ground that she would be justified in testifying as she did on recall by the State to assist in showing that her child was not a bastard, and that although the communications were confidential, that she could testify as she did to protect the legitimacy of her child and explain her reasons for testifying as she did on that trial. The legitimacy of her child was not an issue in the case, and it is a conceded fact, at least the State so showed and the woman testified that she was pregnant long before the defendant married her. Whether it was defendant's child or the child of some other man to whom she had been engaged would not effect the question of the confidential communica-

tions between herself and her husband, at least statements that he made to her, although they might involve a crime, could not be used as evidence against him in this case. The statute expressly prohibits the use of confidential communications by either party to the marital relation during such marital relations or even after its cessation. Another theory of the State was that she had committed perjury in the divorce case, and by this method it was sought to show that fact, and that the perjury committed by her was induced by appellant. None of this was provable in any manner or for any purpose by introducing confidential communications. This was so at common law, and our statute expressly prohibits the use of such testimony. At common law the rule is well settled that neither the husband nor wife can testify to communications or conversations occurring between them during the existence of the marital relation, and neither can testify that the other did or did not mention a certain subject. Beveridge v. Miller, 1 Cor. & R., 364; 11 E. C. L., 421; Owen v. State, 78 Ala., 425; 56 Am. Rep., 40; Goelz v. Goelz, 157 Ill., 33; Robbin v. King, 2 Leigh. (Va.), 140. The same rule is laid down in Texas; among the later cases deciding this question was Gross v. State, 61 Texas Crim. Rep., 176; Walker v. State, 141 S. W. Rep., 243. In the Gross case the matter was thoroughly discussed and many cases cited. There is no rule better established than that which forbids conversations or communications between the husband and wife as witnesses or matters or conversations occurring between them during the marital relation. Henderson v. Chaires, 25 Fla., 26; Goodrun v. State, 60 Ga., 509. In the latter case it was held in prosecutions for assault committed upon the person of another man's wife wherein she had testified on behalf of the State to the assault, it was held her husband was not a competent witness to throw discredit on her evidence by proving that she delayed complaint to him when opportunity to explain presented itself or existed; that "her silence is within the reason and spirit of the rule that guards confidence between husband and wife and protects their respective communications from disclosure by either." Many of the states have enacted statutes expressly recognizing and enforcing the above rule. I deem it unnecessary here to collate the cases, but such is the rule in Arkansas, California, Illinois, Kansas, Massachusetts, Minnesota, Nebraska, New Jersey, New York, North Carolina, South Carolina, Tennessee and Virginia as well as Texas, and this by statutory enactment. See Davis v. Com. 99 Va., 838. It was also laid down as the rule prohibiting communications between husband and wife from being received in evidence applies in the case of a deposition given by the wife containing such testimony. 6 Ency. of Evidence, p. 895-6; French v. Wade, 35 Kan., 391. In Fuller v. Fuller, 177 Mass., 184, which was a divorce suit, it was held that the plaintiff husband was improperly permitted to testify to a conversation between himself and his wife in which he asked her to return home, to which she replied that she would not come and live with his family. That the fact that the conversation

accompanied and explained the act of the wife in leaving her husband, and her mental attitude in that act, was not sufficient to take the conversation out of the operation of the rule established by the Massachusetts statute. It was also held that confessions by the 'wife of adultery with another person, which confessions were made to her husband, cannot be shown in an action by her husband against the paramour. Sanborn v. Gale, 162 Mass., 412; 26 L. R. A., 864; Higham v. Vanosdol, 101 Ind., 160. Nor in an action of libel, by charging the plaintiff with unchastity, can the defendant show by the plaintiff's husband, conversations between them from which it might be inferred that there existed an unlawful intimacy between her and another man. Warner vs. Press Pub. Co., 132 N. Y., 181; see also Dye v. Davis, 65 Ind., 474. Any knowledge acquired by the wife on account of the trust confided to her by her husband, or any fact whatever, should be excluded; whether the husband told it to her out of his mouth or showed it to her in a letter, or pointed it out with his hand, or locked it up and gave her alone access to it by intrusting her with the key. Stanford v. Murphy, 63 Ga., 410. And the word "communication" used in the statute, is to be given a liberal construction. It should not be confined to a mere statement by the husband to the wife, or vice versa, but should be construed to embrace all knowledge upon the part of the one or the other obtained by reason of the marriage relation, and which, but for the confidence growing out of it, would not have been known to the party. See Com. v. Sapp, 90 Ky., 580; 14 S. W. Rep., 834. The bases of this rule excluding communications or conversations between husband and wife during coverture is public policy and is wholly independent of any questions of interest or identity, citing People v. Mullings, 83 Cal., 138; Rivers v. State, 118 Ga., 42; Goelz v. Goelz, 157 Ill., 33. This covers all and every confidential communication from husband to wife or vice versa, and these may not be divulged in any court. Stanford v. Murphy, 63 Ga., 410; see State v. Brittain, 117 N. C., 783. It is the rule both at common law and under the statutes of the various states that this disability of husband and wife continues as to such communications and conservations even after the marital relation has been dissolved by death. The fact of death is said rather to increase than lessen the force of the rule. This has been so decided in the Supreme Court of the United State, in California, Delaware, Georgia, Illinois, Indiana, Kansas, Maine, Michigan, Missouri, Nebraska, New York, Pennsylvania, Tennessee and Texas. Mitchell v. Mitchell, 80 Texas, 101, is here referred to, also Vermont, and Virginia. Without collating the various decisions of these states they will be found collated in note No. 9 on page 897 of 6 vol. Ency. of Evidence, as most of the authorities collated heretofore in this opinion are also to be found in that same work on different pages and in different notes. I make this general reference to the above volume of Ency. of Evidence without putting quotation marks around some of it so that those who care to find the authorities and look this matter

up can readily discover these cases and announced rules. It is also true that the dissolution of the marital relation by divorce does not remove the privilege of confidential communications. This is the rule laid down in California, Illinois, Kentucky, Kansas, Massachusetts, Michigan, Missouri, Pennsylvania, Alabama, North Carolina and Texas, and in fact it seems to be the rule practically wherever the English jurisprudence is known. And it has been laid down as well that a statute expressly making either party to a divorce suit a competent witness, does not modify or repeal a statute reenacting the common law rule of exclusion. See 41 Ga., 613; 28 Mo. App., 97; 13 Mo. App., 591; 14 Mo. App., 418; 13 Mo. App., 588; 170 Penn. St., 71; 26 Atl. Rep., 198. "There was formerly some question whether or not the privilege extended to communications between husband and wife which in their nature did not seem to be confidential, but the general rule was finally adopted that the privilege extended to all communications between husband and wife, although on subjects not confidential in their nature." Dexter v. Booth, 2 Allen (Mass.), 559.

The rule is undoubted in Texas not only by decision but by the statute itself. That the rule may work a hardship some times in preventing the wife or husband from testifying does not enter into the consideration, because all rules of law or evidence will work hardships at some point at some time or other, but whether it works or not hardships or inconvenience, the rule is in favor of the statutory prevention of disclosure. The untold and unfortunate results that might accrue or occur from permitting the husband and wife to testify with reference to confidential communications would be hard to be enumerated and fearful in effect on society. It has been the policy underlying the very basic principle of our government, which is the marital relation, that these communications shall not be disclosed; that these sacred relations incurred by virtue of the marriage state shall remain inviolable and uncovered. If they are uncovered for one reason, they may be uncovered for all reasons that may be thought convenient or inconvenient. I do not purpose to enter into a discussion of whether or not the illegitimate child of witness in this case was that of her husband or of somebody else. It is a matter about which this question has no concern. Suffice it to say in this respect that if the testimony is to be credited at all in this record, the child was illegitimate from some source, and its legitimacy or illegitimacy cannot be made to bear on the defendant's case in a criminal action by uncovering the confidential communications which occurred between him and his wife. It is bad enough to have illegitimate children, but it is still worse to uncover the sacredness of the home. To uncover these matters in court would constitute husband and wife directly or indirectly witnesses against each other in all matters, even of the acutest criminal nature.

I cannot agree with my brethren, and think this judgment ought to be reversed and the cause remanded.